**In re Clarence F. STANBACK, Jr., Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 960740).**

**No. 06–BG–1045.**

District of Columbia Court of Appeals.

Submitted Dec. 5, 2006.
Decided Dec. 29, 2006.

Before RUIZ, GLICKMAN and THOMPSON, Associate Judges.

PER CURIAM:

Respondent Clarence F. Stanback, Jr. was disbarred in 1996 for misappropriation of client funds. *See In re Stanback*, 681 A.2d 1109, 1110 (D.C.1996). In a Report and Recommendation dated September 12, 2006, a copy of which is attached hereto, the Board on Professional Responsibility (the "Board") agreed with the recommendation of the Hearing Committee that respondent be reinstated to membership in the Bar of this Court and to the practice of law in the District of Columbia. For the reasons set out in the Hearing Committee's July 19, 2006 report, which the Board adopted as its own, the Board found that respondent has proven by clear and convincing evidence that he meets the requirements of District of Columbia Court of Appeals Rule XI, ¶ 16(d), in that he has the moral qualifications, competency, and learning in law required for readmission to the practice of law, and that his resumption of the practice of law will not be detrimental to the integrity and standing of the Bar or to the administration of justice or subversive to the public interest.

The Office of Bar Counsel takes no exception to the Board's recommendation, to which we therefore give heightened deference. *See In re Fogel*, 728 A.2d 668, 668 (D.C.1999); *see also* D.C. Bar R.XI, § 16(e). Accordingly, we accept the Board's recommendation, and it is hereby

**ORDERED** that Clarence F. Stanback, Jr. shall be reinstated, without condition, to the practice of law in the District of Columbia, effective immediately.

## REPORT AND RECOMMENDATION
### OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

Petitioner in this proceeding seeks reinstatement to the District of Columbia Bar nine years after his disbarment for intentional misappropriation of estate funds. *See In re Stanback*, 681 A.2d 1109 (D.C. 1996). The petition was assigned to Hearing Committee Three. A hearing was held on July 13, 2005. After full posthearing briefing, the Committee, on July 19, 2006, issued its report finding that Petitioner had established by clear and convincing evidence the requirements for reinstatement set forth in D.C. Bar R. XI, § 16(d) and recommending that he be reinstated. Bar Counsel, by letter dated August 19, 2006, advised the Board that it takes no exception to the Committee's report.

We have examined the record in this matter and conclude that the Committee's findings are fully supported by substantial evidence in the record and that Petitioner demonstrated, by clear and convincing evidence, his fitness to practice law. Under these circumstances, we adopt as our own and incorporate herein the Hearing Committee's Report and the Findings of Fact and Analysis stated therein. A copy of the Hearing Committee's Report is appended hereto.

## RECOMMENDATION

We find that petitioner Clarence F. Stanback, Jr. (1) has the moral qualifications, competency, and learning in law required for the practice of law, and (2) that his resumption of the practice of law will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public

interest. Accordingly, we recommend that the Court find Petitioner fit to resume the practice of law and that, pursuant to D.C. Bar R. XI, § 16(f), the Court enter an order of reinstatement, without condition.

All members of the Board concur in this Report and Recommendation, except Ms. COGHILL–HOWARD, who did not participate.

### REPORT AND RECOMMENDATION OF HEARING COMMITTEE NUMBER THREE

This matter comes to Hearing Committee Number Three on the petition of Clarence F. Stanback, Jr. (hereinafter, "Petitioner"), for reinstatement to the District of Columbia Bar, following a nine-year period of disbarment for intentional misappropriation of estate funds from his client trust account. *See In re Clarence F. Stanback, Jr.,* 681 A.2d 1109 (D.C.1996) (per curiam), Attachment A to Petition for Reinstatement. For the reasons discussed below, the hearing committee finds that Petitioner has established by clear and convincing evidence the requirements for reinstatement set forth in D.C. Bar R. XI, § 16(d),[1] as interpreted and expanded upon in *In re Roundtree,* 503 A.2d 1215, 1217 (D.C.1985). We recommend that the petition be granted and Petitioner reinstated.

### I. FACTS

#### A. *Background on Disbarment*

Petitioner was admitted to the practice of law in the District of Columbia on September 20, 1978. *See In re Clarence F.*

*Stanback, Jr.,* BDN 237–91 (HC Report, November 16, 1993) at 4. Bar Counsel's Exhibit 5. He was ordered disbarred on July 30, 1996, based upon the Court's adoption of the Board's findings that he violated the following disciplinary rules: failure to preserve the identity of estate funds in an identifiable account (DR 9–103(A)); intentional misappropriation (DR 9–03(A)(2)); failure to maintain complete records of estate funds coming into his possession (DR 9–103(B)(3)); and neglect of a legal matter (DR 6–101(A)(3)) (1991).[2] *In re Clarence F. Stanback, Jr.,* 681 A.2d at 1110, 1119. BC Exh. 3. The Court also found that Petitioner violated the Rules of Professional Conduct by commingling/misappropriating funds (Rule 1.15(a)) and failing to keep complete records (Rule 1.15(b)); failing to promptly deliver funds and to tender full accounting (Rule 1.16(d)); failing to protect an estate's interest after termination of the representation by promptly surrendering paper or property (Rule 1.16(d)); failing to represent the client zealously and diligently (Rule 1.3(a)); and interfering with the administration of justice (Rule 8.4(d)) (1991).

All of the violations found grew out of Petitioner's representation of Kathleen and Andrew Doig, which commenced in the fall of 1986 when Petitioner was retained to assist the Doigs as personal representatives of the heirs in probating the estate of Alice Kelly. *In re Stanback,* 681 A.2d at 1111. In a split decision, Associate Judge King, joined by Steadman, A.J., writing for the Court, found that Bar Counsel and Petitioner stipulated to most of the facts supporting the charges.[3] The

---

1. Since *Roundtree* was decided, the reinstatement section of Rule XI was renumbered to § 16(d) and expanded.

2. The "DR" violations were found under the Code of Professional Responsibility. The Code was rescinded on January 1, 1991, and replaced by the Rules of Professional Con-

duct. *See* Order of the Court dated March 1, 1990 (en banc), appearing at p. v of the Rules.

3. The undisputed facts on which the Court relied are set forth in the disciplinary hearing committee's report. BC Exh. 5, In re Stanback, Jr., BDN 237–91 (HC Report, Nov. 16,

opinion of the Court also noted that Petitioner admitted the violations charged. *Id.* However, in that proceeding, Petitioner challenged the hearing committee's findings relating to the *timing* of the misappropriation, contending that the misconduct occurred no earlier than March of 1991, "a time when it is essentially undisputed that his alcoholism substantially affected his professional conduct." *In re Stanback,* 681 A.2d at 1111. Additionally, he argued that, since he was disabled by alcoholism and thus unable to form intent, the denial of his *Kersey* defense [4] was error. *Id.* The Board sustained the hearing committee's rejection of Petitioner's proposed findings on both points. *Id.*

The Court majority found "substantial evidence, not satisfactorily rebutted, that the misappropriation occurred at an earlier time" than that asserted by Petitioner, and sustained the findings of the Board that the misappropriation therefore could not have been caused by the later-occurring disability. *In re Stanback,* 681 A.2d at 1114–15.[5] In particular, the Court held that Petitioner failed to prove by clear and convincing evidence that his ability to carry out his professional duties was impaired by alcoholism at the time he misappropriated client funds. *Id.,* 681 A.2d at 1116–17. Accordingly, the Court ordered mandatory disbarment for intentional misappropriation of client funds. *Id.,* 681 A.2d at 1119.

Chief Judge Wagner dissented on the ground that Petitioner established his disability and its connection with his misconduct. *Id.,* 681 A.2d at 1120.

## B. Petitioner's Decline and Fall in His Professional and Personal Life

Although the hearing committee in the underlying disciplinary proceeding held that Petitioner failed to prove *Kersey* mitigation (alcoholism) at the time of the misappropriation, the committee's findings on this subject, which were accepted by the Board and adopted by the Court, provide a picture of a person spiraling out of control on alcohol and drugs, beginning in 1988 until 1992, resulting in a descent from the pinnacle of his profession [6] to the depths of financial ruin and loss of reputation, and whose self-destructive behavior resulted in enormous personal losses.

Petitioner's gradual disintegration can be seen over the course of his handling of the *Kelly* probate case. Initially, in 1986, petitioner agreed to advise the personal representatives of the estate of Alice Kelly, who died in that year. BC Exh. 4, *In re Stanback,* BPR Rpt., at p. 2. In late August 1990, at the direction of Petitioner, Ms. Doig closed out the estate bank account in West Virginia, and sent a check in the amount of $10,979.75, payable to Petitioner's trust account. *Id.* Petitioner deposited the check in that account. *Id.* Two months later, without the knowledge or consent of his clients, Petitioner withdrew $8,000.00 from the trust account, and commingled the trust funds with funds in his office operating account. He used estate funds to pay his landlord $15,000.00. *Id.*

Petitioner also owed the IRS money. Apparently, the IRS placed a levy on his

---

1993) at 4–9. These facts were adopted by the Board and the Court. 681 A.2d at 1111.

**4.** *In re Kersey,* 520 A.2d 321, 326 (D.C.1987).

**5.** Additionally, Petitioner raised a claim of bias against two members of the disciplinary hearing committee. However, the Board found that he failed to meet the requirements

of such a claim, and the Court agreed. *In re Stanback,* 681 A.2d at 1117, 1119.

**6.** Among other things, Petitioner was the youngest elected President of the Arlington County Bar Association and the first African–American to hold that office. Transcript of June 29, 2005 Reinstatement Hearing ("Tr.") at p. 128, lines 3–6.

trust account. *Id.* at 3. Petitioner withdrew the remaining trust funds around that time, and commingled them with personal funds in a strongbox he kept at home until March 1991. *Id.*

By November 1990, the balance in the trust account dropped to $5,355.02. *Id.* at 3. The amount in the trust account remained below $10, 979.75 from December 3, 1990 though the end of January 1991. *Id.* at 3. The amount in the trust account again fell below $10,979.75 at the end of February 1991, and thereafter never rose to the level owed the estate. *Id.* Petitioner testified at the disciplinary hearing that he "sat on the money" until March 1991, then began using the funds "to live on, to pay obligations." *Id.*

After years of inaction in the probate proceeding, Petitioner's misconduct was brought to light when two of the heirs to the Kelly estate filed complaints with Bar Counsel in May 1991. *Id.* at 3. Petitioner failed to respond to their repeated requests for the status of the probate proceeding. *Id.* at 3. Petitioner ignored Bar Counsel's request for a response. *Id.* Two more Bar Counsel requests for a response also were ignored. *Id.* at 4.

Petitioner also ignored an Order from the Board, issued in December 1991, requiring a response to Bar Counsel's inquiries. *Id.* at 4. A subsequent Order of the District of Columbia Court of Appeals directing Petitioner to show cause why he should not be held in contempt was ignored, as well. *Id.* at 4.

In September 1991, the co-personal representatives terminated Petitioner's representation, and directed him to transfer all assets and records to successor counsel. *Id.* at 4. No assets or records were turned over until February 1992. *Id.* Petitioner's case file was turned over in April 1992, but was found incomplete. Among other things, there were no records after November 1990. *Id.* at 5. Additionally, it appeared that Petitioner failed to file any income tax returns on behalf of the deceased or her estate, or to assure that a personal representative of the estate attended to those responsibilities, and he failed to redeem or liquidate estate assets, and failed to make any distributions to any of the heirs or to file inheritance tax returns on their behalf. *Id.* at 5.

Petitioner's largely self-reported clinical picture during the period 1991–92 period reveals acts of financial desperation that were harmful to his clients (misappropriation and commingling), neglect of the clients' matter, and, ultimately, an abandonment of his clients with his progressive inability to work. In the disciplinary hearing committee's words:

> The medical evidence conclusively established that [Mr. Stanback] suffered from a combination of alcohol abuse or dependence, cocaine abuse, depression, and possible personality disorder.... These conditions were found medically disabling in November, 1991 when [he] was hospitalized following an intervention by family and friends.... The precise point at which this admixture of disorders became disabling is unclear. The medical evidence does not present any clear evidence concerning [his] condition prior to March 1991. [Transcript page omitted.]

BC Exh. 5, *In re Stanback,* HC Rpt. at 12.

The Board review of the clinical evaluations of petitioner's medical witnesses is also illuminating. BC Exh. 4 at 9. The Board considered the testimony of Dr. Stanton E. Samenow, a clinical psychologist, who first met with petitioner in May 5, 1992. Dr. Samenow's information was based upon petitioner's self-reported retrospection on events. Based on his evaluation, Dr. Samenow concluded that petitioner had been alcohol-dependent, but he could not establish the date on which this dependence hardened. Relying on Peti-

tioner's self-reporting, Samenow surmised that "the drinking and use of cocaine occurred in 1988, 1989, 1990, and 1991, with the heaviest drinking and use of cocaine occurring from March or April of 1991 until September of 1991." *Id.* at 9. Because Dr. Samenow did not know how much Petitioner was drinking prior to 1991, he was unable to say how alcohol might have affected Petitioner's judgment prior to that year. *Id.* at 9.

Next, the Board reviewed the testimony of Dr. Ronald D. Wynne, a clinical psychologist, who was Petitioner's expert witness on the question whether Petitioner's ethical misconduct could be considered the result of an alcohol disability. *Id.* at 9. Dr. Wynne first met with Petitioner in May 1993. On the basis of an extensive interview of Petitioner, and review of prior assessments and testing, Dr. Wynne concluded: "during his drinking and drugging years, which were roughly 1987 to 1992, Mr. Stanback clearly warranted a diagnosis of alcohol and probably cocaine dependence." *Id.* at 10. Petitioner had self-reported heavy use of cocaine in 1989, usually twice a week, but occasionally three to four times a week, and continued until at least October or November 1992. *Id.* at 10. Dr. Wynne characterized Petitioner's addiction as being a "mixed chemical dependence," but was unable to say whether Petitioner's misconduct was caused either by alcohol or cocaine usage. *Id.* at 10. He said, "It is probably some combination of the two." *Id.* Dr. Wynne did not diagnose Petitioner as suffering from depression. *Id.*

Dr. David T. George, a psychiatrist, admitted Petitioner to Suburban Hospital in November 1991, following an intervention by Petitioner's family and friends. After treating Petitioner, Dr. George diagnosed both depression and alcohol abuse, both less serious than alcoholism or alcohol dependence. *Id.* at 11.

At the time of treatment, Dr. George could not detect any withdrawal symptoms, nor did he observe evidence of alcohol dependence. *Id.* at 11. He was unable to pinpoint when Petitioner's alcohol dependence started. Id. He described Petitioner's depression as "situational," a "reaction to problems in his life," and not unipolar depression. *Id.*

Susanne Makepeace, then Director of the D.C. Bar's Lawyer Counseling Program, testified on Petitioner's behalf. She stated that she first saw Petitioner in April 1992, and concluded that he had a serious alcohol problem. *Id.* at 11. She referred him to the Kolmac Clinic for an "intensive out-patient program." *Id.* Petitioner completed only three weeks of the 8–month program there, contending that he did not need the treatment. *Id.* Reportedly, he showed up late for the sessions and left early, after disrupting the group. *Id.* The director of the Kolmac program concluded that petitioner viewed the treatment as "superfluous, something he had to go through for legal reasons," and he asked Petitioner to leave the program. *Id.* at 11–12.

Dr. Raymond F. Patterson, a psychiatrist, testified for Bar Counsel with respect to the *Kersey* issues. *Id.* at 12. Dr. Patterson met with Petitioner three times in April 1993, and reviewed all of his medical records. *Id.* at 12. Dr. Patterson's diagnosis was alcohol dependence, cocaine abuse, and dysthymic disorder ("depressive symptoms" of a "lesser or minor" type). *Id.* at 12.

Based upon Petitioner's self-reporting, Dr. Patterson fixed the onset of Petitioner's deterioration in his ability to function sometime during the period March to December 1991, when Petitioner stopped going into his office. *Id.* at 12. It was Dr. Patterson's view that, at that point, Petitioner could no longer carry out his profes-

sional responsibilities, but could form an intent to take the client funds, and he could appreciate that the money did not belong to him and that his conduct was wrong. *Id.* at 13. He said Petitioner was "spiraling down" until he reached March of 1991. *Id.* at 14. The period in between was a "gray area." *Id.* Although Dr. Patterson testified that Petitioner's judgment was impaired at the time of his misappropriation, he did not offer an opinion as to whether it substantially affected his misconduct. *Id.*

On the question whether Petitioner was rehabilitated at the time of the disciplinary hearing, based upon the unequivocal evidence, both the hearing committee and the Board answered in the negative. *Id.* at 18. The Board noted that Ms. Makepeace, who had seen Petitioner most recently, "was so concerned with Petitioner's condition" that she recommended completion of the outpatient treatment at the Kolmac Clinic. *Id.* at 18. She viewed Petitioner's refusal to do so as an indication of his lack of rehabilitation. *Id.* While she considered him to be in the early stages of recovery in the 1992–93 period, Ms. Makepeace was concerned about the risk of relapse. *Id.* at 18.

Dr. Patterson agreed with Ms. Makepeace's assessment at that time, and opined that the "likelihood of relapse is 'fairly high.'" *Id.* at 19.

### C. *Professional Consequences of Petitioner's Misappropriation of Client Funds*

Based upon the Court's determination that Petitioner committed intentional misappropriation, and that he failed to establish *Kersey* mitigation, Petitioner was disbarred in this jurisdiction, effective July 30, 1996. Attachment A to Petition for Reinstatement. There was significant professional fallout in other jurisdictions arising from the disbarment here. Petitioner was disbarred by the United States Court of Appeals for the District of Columbia Circuit on April 22, 1997, based upon reciprocal discipline. Attachment B to the Petition for Reinstatement. On April 2, 1997, Petitioner was disbarred by consent from the Maryland State Bar. Attachment C to the Petition for Reinstatement. The Virginia Bar ordered a 13–month suspension, effective September 19, 1996, continuing through October 31, 1997. Attachment D to Petition for Reinstatement. (Petitioner's VA license was restored). Tr. at 186, line 22 to 187, lines 1–2. Petitioner's license to practice before the U.S. Patent Court was suspended in 1996, with reinstatement subject to completion of a 48–hour course or retaking the Patent exam. Tr. at 187–88. He is also under current suspension by the United States Court of Appeals for the Fourth Circuit, with reinstatement conditioned upon his reinstatement in the Maryland Bar. Tr. at 187; Reinstatement Questionnaire, Answer # 9. In short, beginning in 1996, Petitioner's right to practice law was barred in every jurisdiction in which he was licensed.

### D. *Petitioner's Road to Recovery and Fitness in the Period Following Disbarment*

At his reinstatement hearing before this committee on June 29, 2005, Petitioner was candid about his condition and state of mind during the period of misappropriation of client funds. In his testimony, nine years after disbarment, he concedes that, during the years 1988 through 1991, increasingly, he abused alcohol and cocaine, and battled depression; that he was "self-medicating ... drinking, drugging, depressed ... and it gradually got to a point of being completely out of control." Tr. at 227, lines 8–9, 12–13. He acknowledges that, while his substance abuse and depression were not found to be mitigating factors to the misappropriation, they were

causally related to his misconduct, and they substantially affected his "performance as an attorney and altered his moral compass." Petitioner's Brief, Proposed Findings and Recommendations, filed July 29, 2005, at p. 2.

For purposes of perspective on Petitioner's *fitness* at the time of his misappropriation in 1990, during the disciplinary proceeding conducted in 1993, and currently with his request for reinstatement, nine years after disbarment, Petitioner relies on Dr. George's testimony in the underlying disciplinary hearing to provide a baseline lack of fitness during the period of misappropriation of client funds. Dr. George provided psychiatric care at Suburban in 1991, including, for the first time for Petitioner, intensive therapy and medication to combat both his depression and his substance abuse. *Id.* at 2. Dr. George has continued to follow-up informally with Petitioner on an annual basis. In Dr. George's most recent assessment, he states:

> I believe that Mr. Stanback's misappropriation of funds was an outgrowth of his depression and poor judgment associated with his use of alcohol and drugs. The wrongfulness of his action is something which "he has had to live with every day since then." ... By his account, [Petitioner] has been alcohol and drug free (except for 2 drinks of alcohol in 1992) since his hospitalization in 1991.... Since 1991, [Petitioner] has been productive and has established himself in high profile positions as a teacher/administrator in Prince George's Public Schools; project officer for a Federal Grant in the Department of Health/Addiction Prevention and Recovery Administration; and teaching paralegal and business law for the past four

years as an adjunct Professor for Prince George's Community College.... Clinically, Mr. Stanback makes an excellent impression which is consistent with his recovery from drugs and alcohol and being a responsible citizen.

> In summary, based on the information that I have, it is my judgment that [Petitioner] should be reappointed to the Bar.

Letter of David L. George, dated February 7, 2005, Attachment E to Petition for Reinstatement.

### E. *Petitioner's Employment and Volunteer Activities Since Disbarment*

After Petitioner was precluded from practicing law,[7] he obtained employment with the Prince George's County School Board. He worked first as a vice principal at Fairmount Heights High School, "a very tough school." Tr. at 192, lines 1–7. In the '97–'98 and '98–'99 terms, he taught a course on term papers and speech. Tr. at 193. Without teacher certification, employment with that school system was limited to two years. As Petitioner could not afford the course work at the University of Maryland, his contract was not renewed after the '98–'99 term. Tr. at 193, lines 20–22.

He was unemployed until November 1999. Tr. at 194, lines 1–10. During that period, he developed a contact at the Addiction, Prevention, and Recovery Administration ("APRA"), a division of the District of Columbia Department of Health. Tr. at 194. He was hired under a block grant to work on the District's substance abuse programs. Tr. at 195. When the grant terminated, Petitioner was hired by the District of Columbia directly to work

---

7. When Petitioner was reinstated in the Virginia Bar, he resumed his legal work there for real estate agent and friend, Valerie Green, who would like to see him reinstated in the District and Maryland, as well. Tr. at 166.

in this area. Petitioner's responsibilities have shifted over time from monitoring to fiscal work. His monitoring work related to a treatment readiness program at the D.C. Jail, preparing inmates for residential treatment. Tr. at 197, 198, line 2. As a criminal justice project officer, he had responsibility, *inter alia*, for "grants, contracts, and memorandums of understanding." Tr. at 196, lines 18–19. He then became a contracting officer's technical representative for APRA, responsible for the fiscal oversight of contracts (*e.g.*, monitoring, accounting for disbursements, and handling financial aspects and accounting matters related thereto). Tr. at 201, lines 16–22. Petitioner does not write checks as part of his work. Tr. at 239, lines 2–3.

While in is his current employment, Petitioner has shared his drug and alcohol abuse experiences with those inside and out of the D.C. Jail. Tr. at 198, lines 16–22; Tr. 199, lines1–12. Petitioner also tutors students in math and science. Tr. 175, lines 14–22; Tr. at 176, lines 1–10. Petitioner was also an adjunct professor at Prince George's Community College, teaching courses in Business Law, Legal Research, Introduction to Paralegal Studies, and Legal Writing. Tr. at 176, lines 10–22.

### F. *Petitioner's Efforts to Keep Current on the Law During Disbarment*

From 1997 through 2004, Petitioner regularly took the 12 hours of CLE courses required by the Virginia Bar. Tr. at 204; Pet.'s Exh. 8. He also reviewed the District of Columbia Bar's practice manual for new lawyers, which covers the rules of professional conduct. Tr. at 206. He also took a District of Columbia CLE course on trust accounts. Tr. at 206. Finally, as part of his reinstatement to the Virginia Bar, petitioner took the Multistate Professional Responsibility Exam and passed. Tr. at 206. He was reinstated in Virginia,

and continues to practice there. *See* Pet.'s Exh. 8.

### G. *Petitioner's Efforts to Rebuild His Life*

We credit Petitioner's testimony, which is corroborated by his witnesses, that, since disbarment, he has taken stock of his past behavior and has endeavored to make major changes in his life. After cataloguing the disastrous personal consequences of his misconduct (*e.g.*, divorce after 20 years of marriage, filing bankruptcy, battling depression and substance abuse, and coping with the loss of his parents), Petitioner asserts that the misappropriation was "the worst thing of my life." Tr. at 99, line 19. He then characterized the act of misappropriation of client funds as "the worst thing to do. It is the worst thing that anyone could do in terms of taking anything from anybody ... to hold out as a lawyer ... a person in whom you can put your trust and confidence. I breached that trust. It is the worst thing that one can do in my mind." Tr. at 99, lines 6–8, 12–15.

Ms. Valerie Green, a long-time friend and real estate associate of Petitioner's, who is funding Petitioner's reinstatement petition process, Tr. at 167, testified about the observable changes in Petitioner beginning in 1990. Tr. at 162–163. Ms. Green described the point when she "saw his life go completely to the bottom and that's when he said to himself and to God that he needed direction. That's when I saw a change. Right around the time that he started losing ground in his career, I saw a change in his character." Tr. at 162–63. Ms. Green reported anguished visits from Petitioner in which he "[took] his entire life apart, seeing where it went wrong, establishing a moral compass that came from a spiritual foundation that was to, from that point on, to be based on the

truth of who he knew God said he was and he lived that to its fullest." Tr. at 164, lines 1–11.

Ms. Green also corroborated that Petitioner has a much stronger, more trusting relationship now with his two children. Tr. at 165, lines 1–9.

Although Petitioner has no specific recollection of his actions relating to the misappropriation of client funds, attributing the memory lapses to drug induced blackouts (Tr. 225, lines 2–15; see also discussion in Petitioner's initial post-hearing brief at 5), he readily acknowledges that he spent client funds that should have been deposited and kept in his escrow account, and accepts full responsibility for the misconduct. *Id.* He also recognizes the seriousness of his misconduct, and revealed the circumstances surrounding the misappropriation of client funds to family, friends, former clients, and subsequent co-workers, seeking forgiveness where appropriate. Six of the seven character witnesses for Petitioner testified that he admitted to them he had misappropriated client funds and that he was disbarred for that misconduct: Kenneth Campbell, Tr. at 20, lines 3–9; Helen P. Jones, Tr. at 32, lines 1–15; Frank McDougald, Esq., Tr. at 114, lines 16–22; Tr. at 115, lines 1–15; Adrienne Lewis, Tr. at 136, lines 2–12; Nilgun Floyd, Tr. at 150–52, lines 12–22; Valerie Green, Tr. at 163, lines 6–17.

Since disbarment, Petitioner sought out former clients who had been adversely affected by his depression and drug abuse, apologized for any negative impact from his actions, and sought their forgiveness. Tr. at 139, lines 16–20 (Lewis).

Additionally, Petitioner asserts that he continues to share his experiences (*e.g.*, the effects of depression and alcohol on one's personal life) with inmates of the D.C. Department of Corrections, and that his employment in the substance abuse area since October 1999 as well as his associa-

tion with Lawyers Helping Lawyers during 1991–95 show his "awareness of the debilitating effects of substance abuse and depression, and his commitment toward being a positive recovery role model towards others." Petitioner's initial, post-hearing reinstatement brief at p. 6; Tr. at 198, lines 1–22; Tr. at 199.

Petitioner seeks reinstatement now in the District of Columbia because

I want to be whole again, to—I worked very hard to get to the point where I was and I would like to get back to that. It is not so much for myself, as I will have to admit it was initially for myself. It is more at this point in time to be whole but to be able to get back to be[ing] able to assist people. There are—I get a lot of calls every day about either folks wanting representation from me or needing referrals to lawyers and because I was born and reared in Washington, this is my home. I have property here. I have friends here. I have family here. It is my desire to be an active part of this community and be able to represent my friends and family, as well as in Maryland. . . .

Tr. at 190, line 3–16.

### H. Petitioner's Specific Steps to Take Responsibility, to Make Necessary Modifications in his Behavior, and Steps Taken Toward the Prevention of Future Misconduct

Following an intervention by family, friends, and colleagues in October 1991, Petitioner sought treatment. First, he attended AA meetings on an outpatient basis over 90 consecutive days. Tr. at 217, lines 16–17. Petitioner also voluntarily submitted to an inpatient treatment program at Suburban Hospital. *Id.*

Of particular importance to Petitioner at this point is the renewal of his Christian

faith; he became a born-again Christian. Tr. at 215, line 18. Significantly, in the 14 years since the intervention by family and friends, Petitioner has been drug free and sober, with the exception of a relapse in February 1992. Tr. at 173–174. Moreover, Petitioner continues to take affirmative steps to avoid reversion to depression and substance abuse problems. For example, he was counseled from April 1992 to March 1993 by Susan Makepeace, first director of the Lawyer Counseling Program, D.C. Bar, Tr. at 75, lines 10–22, and from October 1996 to January 1998 by Dr. Schwartz, Ms. Makepeace's successor. Tr. at 76, line 4; Tr. at 51–52. In the early part of his voluntary treatment, Petitioner was subjected to random urinalysis to screen for alcohol and drugs, and he was required to take Anabuse, a drug that makes one violently ill if he drinks alcohol. Tr. at 172, lines 18–22; Tr. at 173, lines 1–12. There was no evidence in Petitioner's medical records that Petitioner ever tested positive. Tr. at 173, lines 6–8.

More recently, in March 2005, Petitioner consulted with Lynn Phillips, a licensed counselor and current Director of the Lawyer Counseling Program for the District of Columbia, seeking clarification of his current status with regard to chemical dependency and depression. Tr. at 50. Ms. Phillips reviewed all of Petitioner's medical records going back to 1991, and screened him for depression during her evaluation. Tr. at 61. Based upon her review and observations, Ms. Phillips testified as to Petitioner's current status, stating that he "has no symptoms that would qualify as ... a depression of any kind," and that he had a dependence on alcohol, but that he is in "full sustained recovery." Tr. at 61–62.

Ms. Phillips confirmed that the "12 steps of AA are built on godly principles." She was fully satisfied that an individual's use of religion, as Petitioner chose to do, is an acceptable alternative to a more mainstream program such as AA. Tr. at 65, lines 13–14. This hearing committee accepts Petitioner's faith-based approach to recovery as a legitimate substitute for participation in AA, particularly in light of his continued sobriety since 1992.

Ms. Phillips also confirmed that "the longer you have [been] in remission, the more likely you are to stay in remission." Tr. 71, lines 3–8. *Compare* the short duration of the sobriety Petitioner had achieved at the time of the underlying disciplinary hearing (approximately four years, with one relapse) and the corresponding skepticism by the medical witness that any prediction could be made at that early point in recovery as to its sustainability, *with* the nearly 14 years of sobriety at the time of the reinstatement hearing, with no relapse since 1992, and the favorable assessments now of Petitioner's ability to stay sober by both Ms. Phillips and Dr. George. Moreover, as Ms. Phillips pointed out, Petitioner surrounds himself in the workplace with people who are also in recovery, and who "would notice if he had been drinking." Tr. at 61, lines 11–15.

Petitioner has also taken control of his financial obligations. He made full restitution to Kathleen and Andrew Doig and the Estate of Alice Kelly. Tr. at 188, lines 7–10. He also paid off an IRS tax levy, Tr. at 185, lines 10–12, and has remained current on his child support payments during the period of his disbarment (except during short periods of unemployment). Tr. at 188, lines 11–18.

## I. *Post–Hearing Record*

The reinstatement hearing was completed in one day. On Petitioner's request, the record was kept open for 14 days for submission of additional evidence: (1) either live testimony from Dr. George, if he was physically able, or his letter of June 24, 2005, which was identified as Petition-

er's Exhibit 10, Tr. at 5 and 209–211; and (2) a copy of a subpoena to the Honorable William T. Newman, Jr., Circuit Court Judge of Virginia, directing the judge to submit his opinion of petitioner's character, together with that opinion. Tr. at 5, 7, 208, and 258. Petitioner's Exhibit 10, the June 24, 2005 letter of Dr. George was submitted in lieu of his testimony. Dr. George's letter of that date simply states that he is recovering from surgery and is unable to attend the reinstatement hearing. PX 10. We are unable to find anything in the post-hearing record regarding the documentary evidence from Judge Newman, which was proferred by Petitioner.

Petitioner's post-hearing briefs argued for reinstatement. Bar Counsel, however, recommends against reinstatement on the grounds that Petitioner does not fully recognize the seriousness of his misconduct and fails to accept responsibility for it. BC Br. at 10.

## II. *Analysis: D.C. Rule XI, § 16(d) and The Roundtree Factors*

■ District of Columbia Court of Appeals Rule XI, ¶ 16(d), governs reinstatement of a disbarred or suspended attorney. That section of the Rule provides that an attorney seeking reinstatement shall have the burden of proof by clear and convincing evidence: "(1) that the attorney has the moral qualifications, competency, and learning in law required for readmission, and (2) that the resumption of law practice will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." Review of whether an attorney has satisfied his burden of proof is conducted within the framework of factors listed in *In re Roundtree*, 503 A.2d 1215 (D.C.1985). *In re Reynolds*, 867 A.2d 977, 984 (D.C.2005). The *Roundtree* factors are: (1) the nature and circumstances of the misconduct for which the attorney

was disciplined; (2) attorney's recognition of the seriousness of the misconduct; (3) attorney's post-discipline conduct, including steps taken to remedy past wrongs and prevent future ones; (4) attorney's present character; and (5) attorney's present qualifications and competence to practice law. *In re Roundtree*, 503 A.2d at 1217.

### *Roundtree I: Nature and Circumstances of Misconduct*

Bar Counsel and Petitioner agree that Petitioner committed very serious misconduct when he misappropriated client funds. While fully accepting responsibility for this misconduct Pet. Br. at 5, Petitioner confesses that he cannot recall the specific details of his misconduct, nor the precise time period, because the misconduct occurred in a period of his life when he was engaged in substance abuse (*i.e.*, alcohol and drugs) and he suffered from depression. Pet. Br. at 5 & n. 1. Petitioner contends that, due to those circumstances, he suffered from "blackouts" during that phase of his life. *Id.*

Bar Counsel views Petitioner's reference to his substance abuse and depression as simply a replay of his failed claim of disability in the disciplinary phase (*i.e.*, Petitioner is making a second attempt to diminish his responsibility for this misconduct), and thus he has failed to accept full responsibility for his misconduct. BC Br. at 5, 7–8. Bar Counsel deems it "incredible" that Petitioner cannot remember the details of his misconduct from August 1990 to March 1992. BC Br. at 8. We do not read Petitioner's testimony and discussion of his substance abuse and depression that way. Moreover, we think Bar Counsel has improperly conflated the first and second *Roundtree* factors.

First, contrary to Bar Counsel's contention, BC Br. at 7, Petitioner did not say that his misconduct was the result of an

alcohol induced blackout. Rather, he said that his drinking and drug abuse led him to act irresponsibly, and his behavior spiraled out of control. Tr. at 227. He admitted that his memory for a lot of specific things during that time is spotty, in part because of blackouts and in part because of his substance abuse. The Committee found this testimony to be credible and did not hear Petitioner say he was not responsible even though he might not remember some of the details of the events leading to his disbarment. There is nothing inconsistent in Petitioner's testimony. He agreed that his misappropriation was the worst thing he could do to a client, and he conceded that he spent some of the money to pay office rent, and later to support himself. Tr. at 222. These admissions are not a denial of responsibility. Indeed, we credit Petitioner's admissions of responsibility and his testimony that his conduct coincided with a period in his life of substance abuse. We do not find, and Petitioner does not assert, that his misconduct was caused by substance abuse.

Bar Counsel also finds a "discrepancy" between Petitioner's testimony at this stage and the Court of Appeals' finding at the disciplinary stage as to when the misappropriation of funds occurred. BC Br. at 8. Bar Counsel contends that Petitioner testified in this reinstatement proceeding that "misappropriation occurred in 1991, and that this was at direct variance with the Court's specific finding that it occurred in the fall of 1990, possibly as early as October of that year." BC Br. at 8, quoting *Stanback*, 681 A.2d at 1114. Bar Counsel challenges petitioner's "stubborn insistence that there was no misappropriation in 1990" as "consistent with his arguments at the disciplinary phase" (*i.e.*, that alcoholism was the cause of his misconduct, that the Court wrongfully rejected his *Kersey* mitigation, and that he was the primary victim of his misconduct). BC Br. at 9. We do not share Bar Counsel's read-

ing of Petitioner's testimony. Petitioner accepted the facts as found by the Court in his disciplinary hearing, including when the commingling and misappropriation occurred. Tr. at 221–223. Petitioner clearly testified that he misappropriated funds in October of 1990 by withdrawing them from the trust account and placing them in his operating account, and then taking money from his operating account and placing it in a "strong box" in his office. Tr. at 223–224. Petitioner's testimony that he did not spend the money in the "strong box" until 1991, Tr. at 224–225, is not a repudiation of the charge that funds were misappropriated in 1990.

Petitioner's testimony, which is corroborated by his witnesses, and otherwise stands unrebutted, speaks to the remorse he feels for the misconduct and harm to clients, and his determination to right the wrongs he inflicted and to turn his life around in profound ways. His testimony and that of his witnesses supports our finding that Petitioner proved his remorse. This testimony was not rebutted to Bar Counsel. Petitioner convincingly testified that taking a client's funds is the worst thing he could have done as a lawyer. *See, e.g.*, Tr. at 99.

As Petitioner explains, he raised a *Kersey* defense at the disciplinary hearing because he thought it was valid. He acknowledges that the panel majority found his evidence insufficient to show that any of his abuses rose to the level of a disability at the time of the misappropriation, while Chief Judge Wagner, in dissent, believed petitioner established a disability at the time of the misappropriation. Pet. Br. at 2. However, he notes that his substance abuse problems were real and that the opinion of the court recognized that his alcoholism developed into a disability within months of the misappropriation. In short, Petitioner asserts, at the reinstate-

ment hearing, he was placing his misconduct in context. Pet. Br. at 2. Moreover, reference to his substance abuse and depression problems, and the steps he has taken since to overcome them, provide a basis for evaluating petitioner's conduct and character since disbarment, which, as discussed *infra*, are critical elements in *Roundtree* reinstatement analysis. The Committee agrees with Petitioner that the testimony about his substance abuse and other problems at the time of the misconduct is relevant to the *Roundtree* analysis in this case.

In conclusion, we find that Petitioner has established by clear and convincing evidence that he fully understands the nature and circumstances of his misconduct.

*Roundtree II: Petitioner's Recognition of the Seriousness of His Misconduct*

Petitioner's testimony in this proceeding, as well as the testimony of his character witnesses and the report of Dr. George, M.D., dated February 7, 2005 (PX 2), convince this reinstatement committee that Petitioner fully recognizes the seriousness of his misconduct. He admitted at the reinstatement hearing that what he did—misappropriation of client funds—was the "worst thing [an attorney] .... can do, ... I breached that trust." Tr. 99. He stated that, in addition to making restitution to the Doigs, he spent the nine years following disbarment attempting to track down other clients he may have disserved, so that he could make amends to them. Pet. Br.at 9. Petitioner's testimony on this point was corroborated by one of his character witnesses, Adrienne Lewis, a long-time friend and spiritual supporter, who described the process Petitioner followed to rectify his wrongs to clients, family, and friends. Tr. 139, lines1–18.

In addition, according to the uncontradicted testimony of Petitioner's witnesses, he was totally candid with family, friends, and professional colleagues regarding his misappropriation and the resulting disbarment. Here, Petitioner made no excuses, blamed no one else, and made it clear that, going forward, he is committed to helping others. Petitioner and his witnesses were credible on this issue and Bar Counsel did not rebut their testimony. Contrast the candor of Petitioner and his witnesses with the non-disclosure in *In re Lee*, 706 A.2d 1032, 1034 (D.C.1998) (Board Rpt. Appended). In that case, the character testimony on behalf of the attorney seeking reinstatement was disregarded because the attorney had not disclosed the details and repercussions of his criminal misconduct.

Perhaps most important, Petitioner demonstrates that he is able to accept the truth about himself. After an intervention by family and friends in October 1991, he voluntarily went to an inpatient rehabilitation program at Suburban Hospital, where he first established a relationship with Dr. George (who continues to perform an annual assessment of Petitioner). Following that program, Petitioner attended 90 AA meetings in as many days. Tr. at 217. Thereafter, he voluntarily consulted with a number of other mental health professionals. *See* Pet.'s Br. at 6, citing his testimony at the reinstatement hearing in which he discussed the type and duration of the professional help he sought during this period. He asserts, without contradiction, that he has remained sober and clean since 1992, with the exception of a relapse in that year only (two drinks). Tr. at 174. He also acknowledges that if he becomes depressed again, he will immediately seek treatment. Tr. at 229. Additionally, he asserts that he renewed his Christian faith—he was "born again"—and that his faith has been a significant source of strength and support. Tr. 215.

Bar Counsel argues that the foregoing evidence should be discounted, and that Petitioner has failed to establish accep-

tance of his responsibility for the misappropriation leading to his disbarment. BC Br. at 9. Bar Counsel bases this conclusion on Petitioner's reiteration of the evidence of drug and alcohol problems, which were raised at his disciplinary hearing on the issue of disability, as an indication that Petitioner continues to attribute his misconduct to an unproven disability. BC Br. at 5. Bar Counsel also argues that the "blackouts" around the time of the misappropriation, as to which Petitioner first testified at the reinstatement hearing, are further evidence that Petitioner does not accept full responsibility for his misconduct. BC Br. at 8–9. However, this view is directly contradicted by Petitioner's testimony, which we credit for the reasons discussed below.

In this proceeding, Petitioner raised the evidence of substance abuse and depression in the early 1990s to give context to his misconduct, not to excuse it, and also to provide a benchmark against which to measure his changed character over the ensuing 15 years.[8] Moreover, it is neither incredible nor implausible to this committee that, in Petitioner's downward spiral in the fall of 1990, his attention to the details of his law practice was at its nadir, and that recollection of specific facts surrounding his misconduct during that period would remain a "fog" some 15 years after the misconduct. *Compare In re Borders,* 665 A.2d 1381, 1383 (D.C.1995), where Bar Counsel questioned the petitioner's recognition of the seriousness of his crime—

conviction for conspiracy to solicit bribe—because the petitioner refused ever to discuss the facts surrounding the crime. Notwithstanding Borders's stonewalling on that aspect, the hearing committee, Board, and Court there credited the petitioner's testimony that he recognized the seriousness of the crime and was genuinely remorseful. *Id.* Here, we believe Petitioner when he says he simply cannot remember the timing of his misconduct. His failure of memory does not diminish his acceptance of responsibility for the misconduct.

Additionally, we do not think Bar Counsel's reliance, BC Br. at 5, on *In re Fogel,* 679 A.2d 1052, 1055 (D.C.1996), is apt. There, petitioner was convicted of a crime of moral turpitude involving stolen property. Although he admitted to these crimes, the hearing committee found, and the Board and Court agreed, that the petitioner consistently understated his role in the criminal enterprise and minimized the seriousness of his misconduct, and failed to disclose the details of his misconduct with those closest to him.

Even less apposite is *In re Molovinsky,* 723 A.2d 406, 409 (D.C.1999), cited in Bar Counsel's brief at 5. In that case, the court found that the attorney's Reinstatement Questionnaire failed to disclose the discipline against him imposed by other jurisdictions or to indicate the existence of and identify the multiple law suits the attorney pursued *pro se,* or to disclose their adverse dispositions.

---

8. Petitioner raised disability in the disciplinary hearing, presumably because he believed he was disabled at the time of the misconduct and he hoped to avoid disbarment. A majority of the court held that he failed to meet his burden of proof. Chief Judge Wagner disagreed in a dissent, and Petitioner submits here (Pet. Br. in Response at 6) that Judge Wagner's assessment of the evidence was correct. Nonetheless, even in the earlier proceeding, Petitioner conceded that he had committed the wrongdoing and that it was a terrible violation of his fiduciary duty to his clients. He has never denied that he acted improperly. And the fact that he raised disability in the disciplinary proceeding held in 1993 should not be used against him in this rehabilitation proceeding 13 years later to undermine the evidence he presented to this committee, which fully demonstrates that he accepts full responsibility for his misconduct, and that he appreciates that it was of the most serious kind.

Here, petitioner has not attempted to shift blame or diminish the seriousness of his misconduct. He certainly has not tried to conceal his wrongdoing. Accordingly, we give full weight to Petitioner's evidence on this element, and find that he has satisfied his burden of proof.

*Roundtree III: Petitioner's Post–Discipline Conduct*

Based upon the uncontradicted evidence, post-disbarment, Petitioner's conduct has been exemplary. Bar Counsel does not dispute this. BC Br. at 10. Among other things, Petitioner has mentored and taught students who were disciplinary problems in a local public school, and tutored children in math and science outside of work. He established a good work routine and favorable reputation in the area of rehabilitation, doing valuable work for his agency and providing voluntary guidance to inmates and troubled youth. He surrounds himself with others who are also in recovery, assuring that any early signs of relapse will be spotted and pointed out to him. He continues to talk with Dr. George on an annual basis, updating his recovery status and his mental health.[9] Petitioner reestablished contact with his two children and has built a sustainable relationship with each that did not exist previously. Finally, he is part of a faith community, which provides him with support.

*Roundtree IV: Petitioner's Present Character*

Rule XI, § 16(a) requires a disbarred member to wait at least five years before seeking reinstatement. Petitioner waited nine years. (*Contrast In re Robinson,* 583 A.2d 691 (D.C.1990) (per curiam), who made three unsuccessful attempts, starting when he first became eligible to peti-

tion, before succeeding on his fourth petition.) In that span of time, Petitioner had ample opportunity to succeed or fail in his recovery from substance abuse, and to transform his life or not. In this, Petitioner's first and only attempt to seek reinstatement, he created a full and complete picture of an individual who transformed himself—both body and soul—and he demonstrated that the positive changes in his life are substantial and permanent. To a person, Petitioner's character witnesses testified to a significant transformation in Petitioner in the years since 1992 to very honest, responsible, and commendable person.

Cognizant of his lifelong recovery from alcoholism and drug abuse, Petitioner also seems to appreciate the potential danger for him of handling client funds. He testified that he would not handle cases involving client funds, period. Tr. at 241. We find his testimony on this issue credible.

Moreover, many of the steps Petitioner has taken since disbarment, which are discussed above in reference to the *Roundtree* III factor (*i.e.,* post-discipline conduct), reflect on his character, as well. For example, establishing a strong relationship with his own children, mentoring troubled youth, and guiding inmates with drug abuse problems has been a large part of his life since disbarment. He also made restitution to the Doigs, and reached out to other clients he might have wronged during the early 1990s. He actively sought to set things right with his family, friends, former clients, and his God.

Notwithstanding these manifestations of good character, Bar Counsel says they are outweighed by Petitioner's failure to accept responsibility for the misconduct that

---

9. Shortly before the reinstatement hearing, Dr. George submitted a report on his annual assessment of Petitioner's progress. PX 2. Dr. George concluded that, "[c]linically, Mr. Stanback makes an excellent impression which is consistent with his recovery from drugs and alcohol and being a responsible citizen," and Dr. George recommends that Respondent be reinstated. *Id.*

led to his disbarment (*i.e., Roundtree* II factor). BC Br. at 10. For the reasons discussed above in our analysis of that factor, we reject Bar Counsel's notion that Petitioner fails to accept responsibility for his misappropriation. Rather, we think this is one of the rare instances where a disbarred attorney is able to turn his life around through his strength of character. We fully credit Petitioner's testimony and that of his witnesses in concluding that Petitioner has changed his life and that as a result of these changes he accepts responsibility for what he did, regrets what he did, and would not repeat any of the actions that lead to his disbarment.

*Roundtree V: Petitioner's Present Qualifications and Competence to Practice Law*

Petitioner has kept up with developments in the law. He is currently a member in good standing in the Virginia bar. PX 8. Petitioner took the ethics portion of the multi-state exam to qualify for reinstatement to the Virginia bar. Since 1998 he has also taken at least the 12 hours of CLE courses required in Virginia, many in the area of legal ethics and office management. Additionally, he subscribes to Web-based legal research programs, reads law journals, and confers with other attorneys.

Petitioner is respected among his professional colleagues. For example, Ms. Lewis, a real estate agent, uses Petitioner's legal skills in VA where he is licensed to practice. She is very impressed with his knowledge and skill in the law, and would like to hire him for cases in the District. She fully supports reinstatement of his license here. Witness Frank McDougald, Jr. is a member of the District of Columbia Bar and a long-time friend of Petitioner's. Tr. at 107–123. Mr. McDougald is fully apprised of the details of Petitioner's misconduct, and has gotten to know him well since they started running together inn 1996. McDougald fully supports Petitioner's reinstatement.

Petitioner asserts that he has established his present qualifications and competence to practice by clear and convincing evidence. Pet.'s Br. at 12–14. Bar Counsel does not dispute that Petitioner has met his burden as to this aspect of the *Roundtree* analysis. BC Br. at 11. We find that Petitioner has met his burden on this element as well.

### Conclusion

On the basis of the record, we find that Petitioner has established by clear and convincing evidence all of the elements of *Roundtree* as well as the requirements of Rule XI, § 16(d). Accordingly, we recommend that the Petition for Reinstatement be granted.